**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| IWONA GRZELAK, derivatively on behalf of THE REALREAL, INC., | C.A. No. _____ |
| Plaintiff, | |
| vs. | DEMAND FOR JURY TRIAL |
| JULIE WAINWRIGHT, MATT GUSTKE, STEVE LO, GILBERT L. "CHIP" BAIRD III, MAHA IBRAHIM, ROBERT KROLIK, MICHAEL A. KUMIN, STEFAN LARSSON, NIKI LEONDAKIS, and JAMES R. MILLER, | |
| Defendants, | |
| and | |
| THE REALREAL, INC., | |
| Nominal Defendant. | |

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

**INTRODUCTION**

Plaintiff Iwona Grzelak ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of Nominal Defendant The RealReal, Inc. ("RealReal" or the "Company"), files this Verified Shareholder Derivative Complaint against Individual Defendants Julie Wainwright, Matt Gustke, Steve Lo, Gilbert L. "Chip" Baird III, Maha Ibrahim, Robert Krolik, Michael A. Kumin, Stefan Larsson, Niki Leondakis, and James R. Miller (collectively, the "Individual Defendants," and together with RealReal, the "Defendants") for breaches of their fiduciary duties as directors and/or officers of RealReal, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and for contribution under Sections 10(b) and 21D of the Securities Exchange

Act of 1934 (the "Exchange Act"). As for Plaintiff's complaint against the Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding RealReal, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet.  Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action that seeks to remedy wrongdoing committed by RealReal's directors and officers from June 27, 2019 through November 20, 2019, both dates inclusive (the "Relevant Period").

2.      RealReal purports to be an online marketplace for consigned, authenticated luxury items, such as clothing and art pieces. RealReal was founded in 201l, and was a private company up until its June 2019 initial public offering (the "IPO").

3.      According to the Company, the key to RealReal's value is its system for authenticating the luxury goods it sells. The Company receives pre-owned luxury goods from various consignors, and purportedly makes use of a large team of authenticators at its facilities to inspect, measure, and price such goods, while weeding out fakes and counterfeits.

4.      On May 31, 2019, before the beginning of the Relevant Period, the Company filed a registration statement on Form S-1 with the SEC (the "Registration Statement") in connection with its planned IPO. The Registration Statement was declared effective on June 27, 2019, and

shares of the Company's stock began trading on NASDAQ. The Company raised approximately $345 million in gross proceeds from the IPO.

5.      On June 28, 2019, the day after the Company's stock began trading on NASDAQ, the Company filed with the SEC a Prospectus on Form 424B4 (the "Prospectus") in connection with the IPO. The Prospectus formed part of and was incorporated into the Registration Statement. The Prospectus, the Registration Statement, and all amendments thereto are collectively referred to herein as the "IPO Documents."

6.      Throughout the IPO Documents, as well as in subsequent press releases, conference calls, and interviews during the Relevant Period, the Individual Defendants represented to the investing public that the Company's authentication process was extraordinarily robust, and was conducted by highly-trained experts. Such lofty representations, however, were far removed from the reality of what was going on at the Company.

7.      The truth was that the large majority of the items that went through the Company's authentication process were not inspected by expert authenticators, but by the Company's copywriters, who were hourly employees with minimal training or experience in authenticating luxury goods, and who were forced to meet strict quotas which left them with little time to authenticate any given item.

8.      Predictably, due to the glaring faults in the Company's authentication process, counterfeit luxury items consistently went undetected, and hundreds of such items were sold to the Company's customers. As was subsequently revealed in an article reporting on issues with RealReal's authentication procedures, the Company went so far as to circulate internal documents detailing the types of counterfeit items that often passed under the radar and were sent to customers.

9.     The IPO Documents also touted year-over-year increases in the Company's purportedly high Average Order Value ("AOV"), which the Company held out as a "key" financial metric. The IPO Documents defined the Company's AOV as the "average value of all orders placed across our online marketplace." As such, even slight fluctuations in the Company's AOV would greatly affect the Company's Gross Merchandise Value ("GMV"), another purportedly "key" financial metric that represented the total amount of money that customers paid for the products on the Company's website.

10.     Yet, these representations too, were misleading, and omitted certain key facts. Due to various luxury goods retailers lowering their prices by way of promotional discounts offered during this period, the Company had, in tandem, begun reducing the prices for its own luxury goods, in order to stay competitive with such retailers. As a result, the Company's year-over-year AOV for the second fiscal quarter of 2019 would decrease by a meaningful amount. Importantly, the Company had been implementing the price cuts that caused this decrease since the first fiscal quarter of 2019, before the start of the Relevant Period. As such, the Individual Defendants would have been aware at the time the IPO Documents were issued that the statements in the IPO Documents touting increases in the Company's AOV were materially misleading, especially in light of the importance of AOV as a metric for investors at the time of the IPO.

11.     The truth began to emerge gradually in the months following the IPO. First, on August 13, 2019, the Company disclosed its financial results for the second fiscal quarter of 2019, revealing the year-over-year decrease in the Company's AOV for that quarter.

12.     On this news, the price of the Company's stock plunged from $17.00 per share at the close of trading on August 13, 2019, to $14.28 per share at the close of trading on August 14, 2019, a drop of approximately 16%.

13.     On September 13, 2019, fashion website Fashionista published an article (the "Fashionista Article")[1] detailing a private investigation into the Company's authentication process, and revealing many of the serious, and as-yet undisclosed problems inherent in the system, including the pressures placed on the Company's minimally trained "authenticators."

14.     On this news, the price of the Company's stock fell from $17.01 per share at the close of trading on September 13, 2019, to $16.75 per share at the close of trading on September 16, 2019, the next trading day.

15.     Over the course of the next several weeks and months, a flurry of articles and reports corroborating the allegations made in the Fashionista Article were published.

16.     On October 23, 2019, Forbes published an article providing facts that supported many of the allegations in the Fashionista article. On the publication of this article, the price of the Company's stock fell from $20.93 per share at the close of trading on October 22, 2019, to $19.03 per share at the close of trading on October 23, 2019, representing a loss in value of over 9%.

17.     On November 5, 2019, CNBC published an article describing its own investigation into the Company's authentication process, including interviews with dozens of former Company employees. On this news, the price of the Company's stock dropped over the course of the next two trading days, from $21.73 per share at the close of trading on November 4, 2019, to $17.93 per share at the close of trading on November 6, 2019, representing a two-day loss in value of 18%.

18.     Finally, on November 21, 2019, CNBC published a follow-up article to its November 5, 2019 article, which described, among other things, "Copywriting Faux and Tell"

---

[1] https://fashionista.com/2019/09/the-realreal-authentication-process-exposed (last visited April 16, 2020).

documents that were circulated among the Company's copywriters, and which contained lists of the different counterfeit products that often slipped through the Company's severely lacking authentication procedures. On this news, the price of the Company's stock dropped once again, falling from $16.93 per share at the close of trading on November 20, 2019, to $16.15 per share at the close of trading on November 21, 2019, representing a loss in value of approximately 5%.

19.     During the Relevant Period, the Individual Defendants breached their fiduciary duties by personally making and/or causing the Company to make a series of materially false and/or misleading statements regarding the Company's business, operations, and prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose, *inter alia*, that: (1) the vast majority of the items the Company authenticated were not processed by the Company's expert authenticators, but by copywriters with minimal training in authentication, and who were allotted insufficient time to authenticate items; (2) hundreds of counterfeit luxury items slipped through the cracks in the Company's authentication process and were sold to customers; (3) the Company's year-to-year AOV for the second fiscal quarter of 2019 had decreased as a result of price cuts that the Company had already been implementing since the first fiscal quarter of 2019; (4) as a result, the Company's business and operating results, including its GMV, would be negatively impacted; and (5) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

20.     The Individual Defendants failed to correct and/or caused the Company to fail to correct these false and misleading statements and omissions of material fact, rendering them personally liable to the Company for breaching their fiduciary duties.

21.     Also in breach of their fiduciary duties, the Individual Defendants failed to maintain internal controls.

22.     In light of the Individual Defendants' misconduct, which has subjected the Company, its Chief Executive Officer ("CEO"), its Chief Financial Officer ("CFO"), its Vice President and Corporate Controller, its Board of Directors (the "Board"), and the underwriters for its IPO to two securities fraud class action lawsuits, one pending in the United States District Court for the Northern District of California, and the other pending in the Superior Court of California, County of Marin (the "Securities Class Actions"), the need to undertake internal investigations, the need to implement adequate internal controls, the losses from the waste of corporate assets, and the losses due to the unjust enrichment of the Individual Defendants who were improperly over-compensated by the Company and/or who benefitted from the wrongdoing alleged herein, the Company will have to expend many millions of dollars.

23.     In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, their collective engagement in fraud, the substantial likelihood of the directors' liability in this derivative action and in the Securities Class Actions, their being beholden to each other, their longstanding business and personal relationships with each other, and their not being disinterested and/or independent directors, a majority of the Board cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

24.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 10(b) of the Exchange Act, 15. U.S.C. § 78j(b), and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f).

25. Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Actions based on violations of the Exchange Act and violations of the Securities Act of 1933 (the "Securities Act").

26. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

27. This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

28. Venue is proper in this District because RealReal is incorporated in this District. In addition, Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

## PARTIES

### Plaintiff

29. Plaintiff is a current shareholder of RealReal. Plaintiff has continuously held RealReal common stock at all relevant times.

### Nominal Defendant RealReal

30. RealReal is a Delaware corporation with its principal executive offices at 55 Francisco Street, Suite 600, San Francisco, California 94133. RealReal's shares trade on the NASDAQ under the ticker symbol "REAL."

### Defendant Wainwright

31. Defendant Julie Wainwright ("Wainwright") is the founder of the Company, and has served as the Company's President, CEO, and Chairperson of the Board since March 2011. According to the Company's Schedule 14A filed with the SEC on April 29, 2020 (the "2020 Proxy Statement"), as of April 20, 2020, Defendant Wainwright beneficially owned 6,025,517 shares of the Company's common stock, which represented 6.8% of the Company's outstanding shares as

of that date. Given that the price per share of the Company's common stock at the close of trading on April 20, 2020 was $9.88, Defendant Wainwright owned over $59.5 million worth of RealReal stock.

32.     For the fiscal year ended December 31, 2019, Defendant Wainwright received $4,971,673 in compensation from the Company. This included $365,000 in salary, $2,479,000 in stock awards, $2,018,998 in option awards, $107,675 in non-equity incentive plan compensation, and $1,000 in all other compensation.

33.     The 2020 Proxy Statement stated the following about Defendant Wainwright:

*Julie Wainwright* founded The RealReal in March 2011 and has served as our Chief Executive Officer and the Chair of our board of directors since March 2011. Previously, Ms. Wainwright served as Chief Executive Officer of SmartNow.com, an online health and wellness company, from February 2008 to January 2011, as President and Chief Executive Officer of Bellamax, a photo-editing software company, from August 2003 to November 2006 and as Interim Chief Executive Officer of OntheFrontier, a firm providing strategic consulting for emerging growth countries, from 2001 to 2002. Prior to OntheFrontier, she served as Chief Executive Officer of Pets.com, an online pet supply company, from February 1999 to January 2001. Ms. Wainwright holds a B.S. in General Management from Purdue University.

**Defendant Gustke**

34.     Defendant Matt Gustke ("Gustke") has served as the Company's CFO since April 2013. According to the 2020 Proxy Statement, as of April 20, 2020, Defendant Gustke beneficially owned 501,560 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 20, 2020 was $9.88, Defendant Gustke owned over $4.95 million worth of RealReal stock.

35.     For the fiscal year ended December 31, 2019, Defendant Gustke received $1,302,304 in compensation from the Company. This included $325,000 in salary, $495,000 in

stock awards, $403,804 in option awards, $76,700 in non-equity incentive plan compensation, and $1,000 in all other compensation.

36.     The 2020 Proxy Statement stated the following about Defendant Gustke:

*Matt Gustke* as served as our Chief Financial Officer since April 2013. Prior to joining The RealReal, Mr. Gustke served as the Chief Financial Officer and Head of Strategy at StubHub, an online ticket exchange company and subsidiary of eBay, an online marketplace and payments company, from January 2010 to April 2013. Mr. Gustke holds a B.S. in Finance and Entrepreneurial Management from the Wharton School at the University of Pennsylvania.

**<u>Defendant Lo</u>**

37.     Defendant Steve Lo ("Lo") has served as the Company's Vice President and Corporate Controller since September 2016.

**<u>Defendant Baird</u>**

38.     Defendant Gilbert "Chip" Baird ("Baird") has served as a Company director since June 2018. He also serves as the Chair of the Nominating and Corporate Governance Committee. According to the 2020 Proxy Statement, as of April 20, 2020, Defendant Baird beneficially owned 7,450,330 shares of the Company's common stock, which represented 8.58% of the Company's outstanding shares as of that date. Given that the price per share of the Company's common stock at the close of trading on April 20, 2020 was $9.88, Defendant Baird owned over $73.6 million worth of RealReal stock.

39.     The 2020 Proxy Statement stated the following about Defendant Baird:

*Gilbert L. (Chip) Baird III* has served on our board of directors since June 2018. Mr. Baird co-founded and has been the Co-head of PWP Growth Equity, the middle market private equity group of Perella Weinberg Partners Capital Management, since February 2012. Mr. Baird also serves on the boards of a number of private companies. He has also previously served as a director of RE/MAX Holdings, an international real estate franchisor company, from July 2013 to February 2015. Mr. Baird holds a B.S. in Finance and International Business from the Pennsylvania State University and an M.B.A. from Harvard Business School.

Mr. Baird was selected to our board of directors because of his experience in finance and capital structure.

**Defendant Ibrahim**

40.     Defendant Maha Ibrahim ("Ibrahim") served as a Company director from July 2012 until she resigned effective June 16, 2020. According to the 2020 Proxy Statement, as of April 20, 2020, Defendant Ibrahim beneficially owned 8,629 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 20, 2020 was $9.88, Defendant Ibrahim owned approximately $85,254 worth of RealReal stock.

41.     The Prospectus stated the following about Defendant Ibrahim:

*Maha Ibrahim* has served on our board of directors since July 2012. Ms. Ibrahim is currently a General Partner at Canaan Partners, an early stage venture capital firm, a position she has held since March 2000. Ms. Ibrahim also serves on the boards of a number of private companies. Ms. Ibrahim is also a trustee for the Carnegie Endowment for International Peace, a foreign policy think tank. Ms. Ibrahim holds a B.A. in Economics and an M.A. in Sociology from Stanford University and a Ph.D. in Economics from the Massachusetts Institute of Technology.

Ms. Ibrahim was selected to our board of directors because of her experience on the board of directors of rapidly growing consumer and technology companies.

**Defendant Krolik**

42.     Defendant Robert Krolik ("Krolik") has served as a Company director since January 2019. He also serves as the Chair of the Audit Committee. According to the 2020 Proxy Statement, as of April 20, 2020, Defendant Krolik beneficially owned 6,666 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 20, 2020 was $9.88, Defendant Krolik owned approximately $65,860 worth of RealReal stock.

43. For the fiscal year ended December 31, 2019, Defendant Krolik received $156,280 in compensation from the Company. This included $50,000 in fees earned or paid in cash and $106,280 in option awards.

44. The 2020 Proxy Statement stated the following about Defendant Krolik:

*Robert Krolik* has served on our board of directors since January 2019. Mr. Krolik currently serves as the General Partner and Chief Financial Officer of Burst Capital, a venture capital investment firm, a position he has held since October 2018. Previously, Mr. Krolik served as the Chief Financial Officer of Yelp, an online platform company that connects people with local businesses, from July 2011 to May 2016. Mr. Krolik also serves on a board of a private company and advises others. Mr. Krolik holds a B.B.A. in Finance from the University of Texas at Austin, is an Aspen Institute Finance Fellow and is a certified public accountant (inactive).

Mr. Krolik was selected to our board of directors because of his experience with rapidly growing technology companies and as the chief financial officer of a publicly-held company.

**Defendant Kumin**

45. Defendant Michael A. Kumin ("Kumin") has served as a Company director since May 2017. He also serves as the Chair of the Compensation Committee, and as a member of the Nominating and Corporate Governance Committee. According to the 2020 Proxy Statement, as of April 20, 2020, Defendant Kumin beneficially owned 9,966,731 shares of the Company's common stock, which represented 11.47% of the Company's outstanding shares as of that date. Given that the price per share of the Company's common stock at the close of trading on April 20, 2020 was $9.88, Defendant Kumin owned over $98.4 million worth of RealReal stock.

46. The 2020 Proxy Statement stated the following about Defendant Kumin:

*Michael A. Kumin* has served on our board of directors since May 2017. Mr. Kumin has worked as an investment professional at Great Hill Partners, a private equity firm, since 2002 where he currently serves as a Managing Partner. Mr. Kumin has served on the board of directors of Wayfair, an ecommerce home goods company, since June 2011 and also serves on the boards of a number of private companies.

12

Mr. Kumin holds a B.A. from Princeton University's Woodrow Wilson School of Public & International Affairs.

Mr. Kumin was selected to serve on our board of directors because of his experience in the consumer retail and ecommerce industries as a private equity investor and his service on the board of directors of other consumer and technology companies.

**Defendant Larsson**

47.     Defendant Stefan Larsson ("Larsson") served as a Company director from January 2019 until he resigned effective June 16, 2020. According to the 2020 Proxy Statement, as of April 20, 2020, Defendant Larsson beneficially owned 16,126 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 20, 2020 was $9.88, Defendant Larsson owned approximately $159,324 worth of RealReal stock.

48.     For the fiscal year ended December 31, 2019, Defendant Larsson received $156,280 in compensation from the Company. This included $50,000 in fees earned or paid in cash and $106,280 in option awards.

49.     The Prospectus stated the following about Defendant Larsson:

*Stefan Larsson* has served on our board of directors since January 2019. Mr. Larsson currently serves as President of PVH, the parent company of Calvin Klein and Tommy Hilfiger, a position he has held since June 2019. Previously, Mr. Larsson was the President and Chief Executive Officer and a director of Ralph Lauren Corporation, a premium lifestyle apparel company, from November 2015 until May 2017. Mr. Larsson served as the Global President of Old Navy, an apparel brand and division of Gap, a global clothing retailer, from October 2012 to October 2015. Prior to Old Navy, Mr. Larsson was a key part of the leadership team that built H&M, a clothing retailer, from $3 to $17 billion in revenue and expanded operations from 12 to 44 countries, from August 1998 to September 2012. Mr. Larsson received a Master of Science in Business Administration jointly from the Hanken School of Economics in Finland and Jônkôping International Business School in Sweden.

Mr. Larsson was selected to serve on our board of directors because of his extensive experience in managing global, diversified retail businesses, along with his in-depth knowledge of the fashion and apparel industry.

**Defendant Leondakis**

50.     Defendant Niki Leondakis ("Leondakis") has served as a Company director since April 2019. She also serves as a member of the Compensation Committee. According to the 2020 Proxy Statement, as of April 20, 2020, Defendant Leondakis beneficially owned 5,416 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 20, 2020 was $9.88, Defendant Leondakis owned approximately $53,510 worth of RealReal stock.

51.     For the fiscal year ended December 31, 2019, Defendant Leondakis received $216,954 in compensation from the Company. This included $37,500 in fees earned or paid in cash and $179,454 in option awards.

52.     The 2020 Proxy Statement stated the following about Defendant Leondakis:

*Niki Leondakis* has served on our board of directors since April 2019. Ms. Leondakis currently serves as the Chief Executive Officer at CorePower Yoga, the largest yoga studio chain in the United States with over 200 studios, a position she has held since January 2020. Previously, Ms. Leondakis served as President of The Wolff Resident experience Company, a real estate hospitality company, from February 2019 to January 2020, as Chief Executive Officer of Equinox Fitness Clubs at Equinox Holdings, a luxury fitness company, from March 2017 to July 2018, as Chief Executive Officer of Hotels and Resorts at Two Roads Hospitality, a lifestyle hotel hospitality company, from November 2012 to March 2017 and as President and Chief Operating Officer of Kimpton Hotels and Restaurants from September 1993 to November 2012.

Ms. Leondakis was selected to serve on our board of directors because of her executive skills and understanding of quality customer experience.

**Defendant Miller**

53.     Defendant James R. Miller ("Miller") has served as a Company director since May 2019. He also serves as a member of the Audit Committee. According to the 2020 Proxy Statement, as of April 20, 2020, Defendant Miller beneficially owned 5,416 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on

April 20, 2020 was $9.88, Defendant Miller owned approximately $53,510 worth of RealReal stock.

54.    For the fiscal year ended December 31, 2019, Defendant Miller received $216,954 in compensation from the Company. This included $37,500 in fees earned or paid in cash and $179,454 in option awards.

55.    The 2020 Prospectus stated the following about Defendant Miller:

*James R. Miller* has served on our board of directors since May 2019. Mr. Miller is the Chief Technology Officer at Wayfair, an ecommerce home goods company and previously served as the interim Chief Technology Officer at Wayfair from August 2019 to April 2020. Prior to Wayfair, Mr. Miller served as Strategic Advisor of AREVO, a computer software and 3D printing company, from January 2019 to June 2019, and as the Chief Executive Officer of AREVO, from February 2018 to December 2018. Mr. Miller also served as Vice President, Global/Worldwide Operations of Google, an internet service and products company, from July 2010 to February 2018. Mr. Miller currently serves on the boards of Brambles, LTD and on the boards of a number of private companies. He has also previously served on the board of directors of Wayfair. from July 2016 to April 2020 and the Corporate Eco Forum, a corporate sustainability organization, from July 2008 to June 2018. Mr. Miller holds a B.S. in aerospace engineering from Purdue University, an M.S. in mechanical engineering from Massachusetts Institute of Technology and an M.B.A. from MIT's Sloan School of Management.

Mr. Miller was selected to serve on our board of directors because of his extensive experience in scaling operations in rapidly-growing internet companies.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

56.    By reason of their positions as officers, directors, and/or fiduciaries of RealReal and because of their ability to control the business and corporate affairs of RealReal, the Individual Defendants owed RealReal and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage RealReal in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of RealReal and its shareholders so as to benefit all shareholders equally.

15

57.     Each director and officer of the Company owes to RealReal and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

58.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of RealReal, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

59.     To discharge their duties, the officers and directors of RealReal were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

60.     Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of RealReal, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.  The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised RealReal's Board at all relevant times.

61.     As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants had a duty to prevent and not to effect the dissemination of

inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information.

62.     To discharge their duties, the officers and directors of RealReal were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company.  By virtue of such duties, the officers and directors of RealReal were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware and the United States, and pursuant to RealReal's own Code of Ethics and Business Conduct (the "Code of Conduct");

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     remain informed as to how RealReal conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)     establish and maintain systematic and accurate records and reports of the business and internal affairs of RealReal and procedures for the reporting of the business and

internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)     maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that RealReal's operations would comply with all applicable laws and RealReal's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)     exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)     refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)     examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

63.     Each of the Individual Defendants further owed to RealReal and the shareholders the duty of loyalty requiring that each favor RealReal's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

64.     At all times relevant hereto, the Individual Defendants were the agents of each other and of RealReal and were at all times acting within the course and scope of such agency.

65.     Because of their advisory, executive, managerial, and directorial positions with RealReal, each of the Individual Defendants had access to adverse, non-public information about the Company.

66.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by RealReal.

### CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

67.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing.  The Individual Defendants caused the Company to conceal the true facts as alleged herein.  The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

68.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, and abuse of control; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects and internal controls; and (iii) to artificially inflate the Company's stock price.

69.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of RealReal was a

direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

70.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

71.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of RealReal, and was at all times acting within the course and scope of such agency.

## REALREAL'S CODE OF CONDUCT

72.     The Company's Code of Conduct provides that "Everyone is required to understand and follow the [Code of Conduct] - there are no exceptions."

73.     In a section titled, "Our Mission and Values," the Code of Conduct states, in relevant part, that "[w]e stand behind the authenticity of the products sold on our site and we strive for authenticity in everything we do."

74.     In a section titled, "Employee Rules, the Code of Conduct states the following, in relevant part:

> Part of your job is to know the laws, regulations and company policies that apply to your role and the countries in which you work. Comply with them. If local laws or policies are more restrictive than those outlined in the Code, follow the more restrictive requirements.
>
> Report all concerns of possible violations of the law.

Promptly raise any concerns you have about potential violations of the Code. If ever a concern is not resolved to your satisfaction, talk to the Legal department or HR.

75. In a section titled, "Rules for Leaders," the Code of Conduct states, in relevant part, that "[m]anagers are expected to be role models, to create a strong values-driven culture of compliance, accountability, authenticity and the highest ethical standards."

76. In a section titled, "Protect Our Company Assets," the Code of Conduct states the following, in relevant part:

You will always be equipped with the tools you need to perform your responsibilities and be successful in your job. It is your responsibility to protect those tools, to use them responsibly and ensure that your company equipment is used for business and not personal purposes, subject to what incidental personal use is reasonable and permitted by company policy. If you're unsure, please ask.

\* \* \*

Whenever you're spending company money, make certain the costs are both reasonable and directly related to company business, properly documented and consistent with applicable company policy (see TRR Signature Authority Policy and Expense Reimbursement Policy).

77. In a section titled, "External Communications & Disclosure," the Code of Conduct states the following, in relevant part:

Our public disclosures, whether of financial or other business information, will be fair, accurate, timely and understandable. It is of paramount importance to The RealReal that all disclosure in reports and documents that The RealReal files with regulatory agencies, and in public communications we make, is full, fair, accurate, timely and understandable. We prohibit falsification of our books and records, such as mischaracterizing transactions, hiding funds or accounts, reporting transactions in the wrong time period or other false or misleading information. Off the books transactions and "second sets of books" are strictly prohibited. You should always assist The RealReal in fulfilling these responsibilities consistent with your role within The RealReal, and provide prompt and accurate answers to all inquiries made to you in connection with The RealReal's preparation of its financial reports and any public disclosure. If you have reason to believe that any of our books and records are being maintained in a materially inaccurate or incomplete manner, you should report this immediately to the Legal department and the Internal Controls management. Please refer to the Internal Controls and Financial Records section of the Code for more information.

We rely on you to come forward if you feel that you are being pressured to prepare, alter, conceal or destroy documents in violation of our company policy. In addition, if you have any reason to believe that someone has made a misleading, incomplete, or false statement to an accountant, auditor, attorney or government official in connection with any investigation, audit, examination or filing, you should speak up.

78.     In a section titled, "Internal Controls and Financial Records," the Code of Conduct

states the following, in relevant part:

Maintaining internal controls and ensuring complete, accurate, and timely books, records and disclosures is more than a legal requirement at TRR; it is core to how we do business and essential to our success. Our customers, partners, suppliers and investors rely on the information we provide to decide whether to purchase our products, partner with us or invest in our shared future.

As a TRR employee, you're required to follow the internal controls that apply to your job or function. As a TRR manager or executive you're responsible for ensuring that an effective operating system of internal controls related to your function is in place, that addresses the company's business needs and compliance requirements.

* * *

At TRR, we require that you accurately record sales, revenue, expenses, operational data, decision metrics and other essential company information. This includes:

- Providing complete, accurate and transparent information in all reports, records and expense claims.
- Providing accurate and complete backup for all expenses.
- Never deliberately making a false, artificial or misleading entry in a report, record or expense claim.
- Never establishing or maintaining an undisclosed or unrecorded side agreement, account, fund or asset.

79.     In violation of the Code of Conduct, the Individual Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, gross mismanagement, abuse of control, waste of corporate assets, and unjust enrichment, and aiding and abetting thereof.

22

Moreover, in violation of the Code of Conduct, the Individual Defendants failed to comply with laws and regulations, maintain the "accuracy of company records, public reports and communications," and uphold the employee and director responsibilities related thereto.

## THE INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

80.     RealReal is a San Francisco, California-based online retailer founded in 2011. The Company provides a curated, online marketplace for consigned, authenticated luxury items, including clothing, jewelry, and art produced by such designers as Cartier, Chanel, Christian Louboutin, Gucci, Hermès, Louis Vuitton, Prada, Rolex, and more.

81.     Prior to the Relevant Period, RealReal was a private company. In June 2019, the Company conducted its IPO, pursuant to which the Company sold over 17 million shares priced at $20 per share, and received roughly $345 million in proceeds.

### The Company's Authentication Process

82.     In the IPO Documents and throughout the Relevant Period, the Individual Defendants consistently touted the robustness and the importance of the Company's authentication system. For instance, the IPO Documents described the process as follows:

> We authenticate every item we sell to continue building trust in our online marketplace. We employ over 100 highly trained gemologists, horologists, brand experts and art curators who collectively inspect thousands of items each day. All items pass through a rigorous multi-point, brand-specific authentication process before they are accepted for consignment. This process includes inspecting the item for attributes such as appropriate brand markings, date codes, serial tags and hologram stickers. Our gemologists and horologists authenticate and inspect our fine jewelry and watches, and each piece comes with an authentication certificate. In addition, our team of fine art curators and specialists research and validate art pieces for authenticity. We have a zero-tolerance policy when it comes to counterfeit goods. Items that are deemed to be counterfeit are confiscated.

83.     Unbeknownst to the investing public, however, the significant majority of the items that went through the Company's authentication process were not inspected by "highly trained"

experts, such as gemologists or art curators, but by the Company's copywriters, who were given minimal training in authenticating luxury goods, and were afforded little time to authenticate items.

84.     Predictably, due to these and other faults in the Company's authentication process, counterfeit luxury items consistently went undetected, and hundreds of counterfeit items were sold to the Company's customers.

85.     Over a dozen former employee witnesses cited to in one of the Securities Class Actions made statements corroborating these details and offering insight into certain of the Individual Defendants' awareness of the problems inherent in the Company's authentication process.

86.     A former Company employee who worked in the photography department of the Company's Secaucus, New Jersey facility between January 2018 and March 2019 stated that copywriters received little training on spotting counterfeits, and were heavily overworked. This former employee also noted that Defendant Wainwright visited the facility several times, and likely would have been fully appraised as to how the authentication system functioned at that facility.

87.     A former copywriter who worked at the Secaucus, New Jersey facility between August 2018 and March 2019 indicated that copywriters were only given a few minutes to authenticate each product, and for the most part had to train themselves.

88.     A former employee who worked in shipping and receiving at the Company's Brisbane, California facility between June 2018 and November 2018 stated that Defendant Wainwright often visited this facility as well, and was typically accompanied by other senior company executives during her visits.

89.     According to a former copywriter who worked as a supervisor at the Brisbane, California facility between 2016 and March 2018, most of the products the Company received from cosigners went straight to the copywriters, who typically had no experience in fashion or authentication.

90.     One former employee, a former senior vice president, served as the Company's chief human resources officer from May 2017 until August 2018, and was a member of the Company's executive committee. The former senior vice president indicated that there was a very small team of expert authenticators, who reviewed only a small portion of the items the Company received—the rest of the items were authenticated by the copywriters. The former senior vice president also claimed that all of the Company's senior executives were fully aware of the problems with the authentication system, which were extensively documented.

91.     Another former copywriter and supervisor at the Brisbane, California facility, who worked for the Company from 2017 until August 2019, claimed that the quotas set for the Company's copywriters were far too high, and that most copywriters were confused about their tasks and lacked sufficient training. This former employee personally received copies of the "Copywriting Faux and Tell" documents circulated internally by the Company's management.

92.     A former senior copywriter who worked at the Brisbane, California facility from September 2016 through April 2019 detailed the high-pressure environment at the facility, noting the strict quotas that copywriters were forced to meet, and stating that copywriters were instructed to continue working during the 2018 California wildfires, even as smoke from the wildfires entered the facility.

93.     A former copywriter for men's items at the Brisbane, California facility between November 2017 and August 2018 indicated that copywriters were typically responsible for

authenticating hundreds of items each day, with initial training for copywriters consisting of a single PowerPoint presentation.

94.     According to a former copywriter for shoes, handbags, and art who worked at the Brisbane, California facility from May 2018 to June 2019, the quality of authentication was significantly affected by the speed at which copywriters were forced to inspect items, as copywriters were afforded little time to make precise measurements or double-check their work.

95.     Another senior copywriter who worked at the Brisbane, California facility between August 2018 and November 2019 stated that most of the Company's copywriters came from backgrounds that had nothing to do with fashion or luxury goods, and that the authentication process was essentially trial and error.

96.     A former luxury manager who worked at the Company's Los Angeles, California officer between 2015 and 2017 indicated that Defendant Wainwright and the rest of the Company's senior executives were familiar with every aspect of the Company's authentication process, and were fully aware of the problems inherent in the process.

97.     One former employee served as the Company's vice president of fulfillment between April 2016 and December 2017, and was also a member of RealReal's executive committee. The former vice president of fulfillment worked out of the Company's headquarters in San Francisco, and confirmed that the Company's executive management reviewed reports concerning counterfeit items on the Company's website on a weekly basis. The former vice president further claimed that Defendant Wainwright was almost certainly involved in setting the quotas for copywriters at the Company's facilities.

98.     Lastly, a former photography production assistant, and later senior copywriter who worked at the Brisbane, California facility from December 2017 until November 2019 noted that

despite having little time to absorb their training, copywriters who failed to meet their quotas would be subjected to disciplinary measures, up to and including termination. This former employee also corroborated the claim that Defendant Wainwright frequently visited the Brisbane, California facility.

### The Company's AOV Metric

99.     The IPO Documents also touted year-over-year increases in the Company's AOV. The IPO Documents defined the Company's AOV as the "average value of all orders placed across our online marketplace." As such, even slight fluctuations in the Company's AOV would greatly impact the Company's GMV, which represented the total amount of money that customers paid for the Company's products during a given period of time.

100.     Prior to the Relevant Period, however, various luxury goods retailers began lowering their prices by way of certain promotional discounts. Because the Company operates in the luxury resale market, the prices of new luxury goods necessarily impact the prices the Company can realistically set for the pre-owned goods it sells on its website. As such, in order to remain competitive, the Company began reducing its own prices to reflect the decreases in the prices of new goods. This had the effect of causing the Company's year-over-year AOV for the second fiscal quarter of 2019 to decrease from $453.32 to $452.61.

101.     Because the Company had been implementing the price cuts that caused this decrease since the first fiscal quarter of 2019, before the start of the Relevant Period, the Individual Defendants would have been aware that the statements contained in the IPO Documents touting increases in the Company's AOV were materially misleading, especially in light of the importance of AOV as a metric for investors at the time of the IPO.

### The Individual Defendants' Duty to Disclose

102.    SEC Regulation S-K imposes certain affirmative disclosure requirements on public companies, such as RealReal, with respect to their finances and operations. Specifically, Item 303(a)(3) of Regulation S-K required RealReal to:

> Describe any unusual or infrequent events or transactions or any significant economic changes that materially affected the amount of reported income from continuing operations and, in each case, indicate the extent to which income was so affected. In addition, describe any other significant components of revenues or expenses that, in the registrant's judgment, should be described in order to understand the registrant's results of operations.
>
> Describe any known trends or uncertainties that have had or that the   registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations. If the registrant knows of events that will cause a material change in the relationship between costs and revenues (such as known future increases in costs of labor or materials or price increases or inventory adjustments), the change in the relationship shall be disclosed.

103.    As such, the Individual Defendants had a duty under Item 303 of Regulation S-K to disclose that the Company had been selling numerous counterfeit items due to its faulty authentication process, and that the Company's AOV had been decreasing since the first quarter of 2019, as these transactions constituted (i) unusual transactions or significant economic changes materially affecting the Company's reporting income, and (ii) known trends or uncertainties that have had or should be reasonably expected to have a material impact on the Company's revenue or income.

**False and Misleading Statements**

***The IPO Documents***

104.    On May 31, 2019, before the beginning of the Relevant Period, the Company filed the Registration Statement with the SEC, in connection with the IPO. The Registration Statement was signed by Defendants Wainwright, Gustke, Lo, Baird, Ibrahim, Krolik, Kumin, Larsson,

Leondakis, and Miller. The Company subsequently filed several amendments to the Registration

Statement, and the Registration Statement was declared effective on June 27, 2019.

105.     On June 28, 2019, the day after the Company's stock began trading on NASDAQ,

the Company filed the Prospectus with the SEC, in connection with the IPO. The Prospectus

formed part of and was incorporated into the Registration Statement.

106.     With respect to the Company's authentication process, the IPO Documents stated

the following, in relevant part:

> We offer buyers a vast, yet curated supply of pre-owned luxury goods and instill trust in the buying process. In 2018, we added approximately 2.6 million new items to our online marketplace. ***Our highly trained experts build trust in our buyer base by thoroughly inspecting the quality and condition of, and authenticating, every item we receive***. This trust drives repeat purchases from our buyer base and instills confidence in first-time buyers to purchase pre-owned luxury goods.
>
> A strong network effect drives the growth of our online marketplace. As we bring more consignors onto our platform, we unlock more high-quality, luxury supply, which increases our merchandise assortment and attracts more buyers. This, in turn, increases sales velocity and commissions for our consignors. In addition, a meaningful share of our consignors become buyers and vice versa, which creates a differentiated flywheel that enhances the network effect of our online marketplace.
>
> * * *
>
> ***We do the work on behalf of consignors. Once consigned items reach one of our four merchandising and fulfillment facilities, we authenticate, write the associated copy, photograph, price, sell and handle all fulfillment and returns logistics, making the process seamless for the consignor***.
>
> * * *
>
> ***We authenticate every item we sell to continue building trust in our online marketplace. We employ over 100 highly trained gemologists, horologists, brand experts and art curators who collectively inspect thousands of items each day. All items pass through a rigorous multi-point, brand-specific authentication process before they are accepted for consignment***. This process includes inspecting the item for attributes such as appropriate brand markings, date codes, serial tags and hologram stickers. Our gemologists and horologists authenticate and inspect our fine jewelry and watches, and each piece comes with an authentication certificate. In addition, our team of fine art curators and specialists research and validate art

pieces for authenticity. ***We have a zero-tolerance policy when it comes to counterfeit goods***. Items that are deemed to be counterfeit are confiscated.

(Emphasis added.)

107.    The IPO Documents noted the "pervasiveness" of counterfeit goods in the luxury resale market, as well as a lack of effective authentication standards on the part of RealReal's competitors, stating the following, in relevant part:

> ***Due to the pervasiveness of counterfeit luxury goods and inconsistent authentication standards, buyers can be hesitant to purchase pre-owned luxury goods***. The global trade in counterfeit goods in 2016 was over $509 billion, according to the Organisation for Economic Co-operation and Development. ***Peer-to-peer marketplaces and consignment stores do not authenticate effectively as they do not take physical possession of the item, have inconsistent authentication standards or do not employ expert authenticators***. Furthermore, the quality of photos and accuracy of descriptions vary widely and are often misleading. There is a lack of transparency as buyers are not able to easily obtain information such as fair market value or verify authenticity.

(Emphasis added.)

108.    The IPO Documents further purported that the Company's "rigorous" authentication process was critical to building and maintaining the trust of RealReal's customers, stating the following, in relevant part:

> We build trust by expertly authenticating every item. We employ more than 100 gemologists, horologists, brand experts and art curators. Our authenticators are highly trained, experienced experts in their respective fields. ***Each item we receive is put through a rigorous, multi-point authentication process before it is curated onto our online marketplace***. As a result, we believe we have become the most trusted online marketplace for pre-owned luxury goods.
>
> \* \* \*
>
> Trust is the cornerstone of our online marketplace. Consignors trust us because we treat their items with the utmost care and quickly sell them at the optimal price. ***Buyers trust us because we have a rigorous authentication process***. We believe the trust and personal relationships that we have built with both consignors and buyers over the past eight years cannot be easily replicated.

(Emphasis added.)

109.    In a discussion of the various risks facing the Company, the IPO Documents stated the following, in relevant part:

> ***As an online marketplace for pre-owned luxury goods, our success depends on the accuracy of our authentication process. Failure by us to identify counterfeit goods could adversely affect our reputation and expose us to liability for the sale of counterfeit goods.***
>
> Our success depends on our ability to accurately and cost-effectively determine whether an item offered for consignment is an authentic product, a genuine gemstone or piece of jewelry or a validated work of art. From time to time we receive counterfeit goods for consignment. While we have invested heavily in our authentication processes and we reject any goods we believe to be counterfeit, we cannot be certain that we will identify every counterfeit item that is consigned to us. As the sophistication of counterfeiters increases, it may be increasingly difficult to identify counterfeit products. We refund the cost of a product to a buyer if the buyer questions its authenticity and returns the item. ***The sale of any counterfeit goods may damage our reputation as a trusted online marketplace for authenticated, pre-owned luxury goods which may impact our ability to attract and maintain repeat consignors and buyers. Additionally, we may be subject to allegations that a pre-owned luxury item we sold is not authentic despite our confirmed authentication of such item. Such controversy could negatively impact our reputation and brand and harm our business and operating results.***

(Emphasis added.)

110.    In a section titled, "Inbound Merchandising Operations," the IPO Documents listed "Authentication" and "Photography and Copywriting" as two separate bullet points, implying that such operations were separate and distinct. The IPO Documents further stated that "[o]nce we receive consigned items, our merchandising team leverages our technology platform and data analytics capabilities for a first point of authentication and to efficiently write copy, photograph and price the items before they are curated onto our online marketplace."

111.    The IPO Documents displayed the following graphic indicating that "Copywriting" occurred after "Authentication" as a chronologically distinct step:



112.    The statements referenced above in ¶¶ 102–107 were materially false and misleading because they failed to disclose, *inter alia*, that: (1) the vast majority of the items the Company authenticated were not processed by the Company's expert authenticators, but by copywriters with minimal training in authentication, and who were allotted insufficient time to authenticate items; (2) hundreds of counterfeit luxury items slipped through the cracks in the Company's authentication process and were sold to customers; and (3) the Company failed to maintain internal controls.

113.    The IPO Documents also discussed the Company's AOV, and defined that metric as follows:

> Average order value ("AOV") means the average value of all orders placed across our online marketplace, excluding shipping fees and sales taxes. Our focus on luxury goods across multiple categories drives a consistently high AOV. Our AOV reflects both the average price of items sold as well as the number of items per order. **Our high AOV is a key driver of our operating leverage.**

(Emphasis added.)

114.    Regarding the Company's financial results for the fiscal quarter ended March 31, 2019, the Prospectus stated the following:

> The growth in revenue was driven primarily by a 42% increase in GMV resulting from growth in both active consignors and active buyers in the three months ended March 31, 2019 compared to the three months ended March 31, 2018, as well as an improvement from 35.1% to 35.3% in our take rate due to changes to our commission structure that yielded a higher take rate on lower-priced items. GMV

growth was driven by a 40% increase in active buyers, as well as a 1% increase in AOV. Active buyer growth was driven by an increase in new buyers due to the combination of our effective marketing spend and consignors becoming buyers, and an increase in repeat buyer orders as a percentage of total orders.

115.    Regarding the Company's financial results for the fiscal year ended December 31, 2018, the Prospectus stated the following:

Consignment and service revenue increased by $62.8 million, or 52%, in 2018 compared to 2017. The growth in revenue was driven primarily by a 44% increase in GMV in 2018 compared to 2017 resulting from growth in both active consignors and active buyers in 2018, as well as an improvement from 33.7% to 35.5% in our take rate due to changes to our commission structure that yielded a higher take rate on lower-priced items. GMV growth was driven by a 43% increase in active buyers, as well as a 2% increase in AOV. Active buyer growth was driven by an increase in new buyers due to the combination of our effective marketing spend and consignors becoming buyers, and an increase in repeat buyer orders as a percentage of total orders.

116.    Under the heading, "Key Financial and Operating Metrics," the IPO documents provided the following table detailing year-over-year changes in the Company's AOV, for both the full year ended December 31, 2018 and the fiscal quarter ended March 31, 2019:

| | Year Ended December 31, | | | | Three Months Ended March 31, | | | |
|---|---|---|---|---|---|---|---|---|
| | 2017 | | 2018 | | 2018 | | 2019 | |
| | (In thousands, except AOV and percentages) | | | | | | | |
| GMV | $ | 492,205 | $ | 710,750 | $ | 158,378 | $ | 224,116 |
| NMV | $ | 349,229 | $ | 506,589 | $ | 113,347 | $ | 160,538 |
| Number of orders | | 1,123 | | 1,595 | | 356 | | 498 |
| Take rate | | 33.7% | | 35.5% | | 35.1% | | 35.3% |
| Active buyers | | 291 | | 416 | | 326 | | 456 |
| AOV | $ | 438 | $ | 446 | $ | 445 | $ | 450 |
| Adjusted EBITDA | $ | (44,297) | $ | (58,856) | $ | (11,342) | $ | (18,478) |

117.    The IPO Documents touted the increases in the Company's AOV as evidence of the Company's overall growth and success, stating the following:

We generate revenue from orders processed through our website, mobile app and three retail stores located in New York and Los Angeles. Our revenue is primarily based on our take rates from these transactions. ***Our growth and success are evidenced by our operating and financial results in 2018:***

- We processed 1.6 million orders, up 42% over 2017.

- ***Our average order value was $446, up 2% over 2017.***
- Our GMV was $710.8 million, up 44% over 2017.
- Our NMV was $506.6 million, up 45% over 2017.
- Our total revenue was $207.4 million, up 55% over 2017.
- Our gross profit was $136.9 million, up 56% over 2017.

(Emphasis added.)

118.    Lastly, the IPO Documents discussed the impact of potential price reductions on the Company's GMV in the list of risks facing the Company, implying that such risks had not already materialized, and stating the following:

> National retailers and brands set their own retail prices and promotional discounts on new luxury goods, which ***could*** adversely affect our value proposition to consumers.

> National retailers and brands set pricing for new luxury goods. Promotional pricing by these parties ***may*** adversely affect the value of products consigned with us and our inventory, and, in turn, our gross merchandise value ("GMV") and operating results. In order to attract buyers to our online marketplace, the prices for the pre-owned luxury goods sold through our online marketplace ***may*** need to be lowered in order to compete with these pricing strategies, which ***could*** negatively affect gross merchandise value and in turn, our revenue. We have experienced a reduction in our GMV in the past due to fluctuations in the price of new luxury goods sold by retailers and brands, ***and we anticipate similar reductions and fluctuations in the future.*** Any of the foregoing risks could adversely affect our business, financial condition and operating results.

(Emphasis added.)

119.    The statements referenced above in ¶¶ 109–114 were materially false and misleading because they failed to disclose, *inter alia*, that: (1) the Company's year-to-year AOV for the second fiscal quarter of 2019 had decreased as a result of price cuts that the Company had already been implementing since the first fiscal quarter of 2019; (2) as a result, the Company's business and operating results, including its GMV, would be negatively impacted; and (3) the Company failed to maintain internal controls.

34

*June 28, 2019 Squawk on the Street Segment*

120.     On June 28, 2019, the same day the Prospectus was filed with the SEC, Defendant Wainwright appeared as a guest on "Squawk on the Street," a television program airing on CNBC. During the program, Defendant Wainwright touted the Company's authentication process, stating that "every single item on the site has already been inspected, authenticated before it gets on the site. … We employ over 100 experts … our brand authenticators also train people, so it happens every single day, on a regular basis, and we put it through a rigorous multi-point inspection process."

121.     The statements referenced in ¶ 116 were materially false and misleading because they failed to disclose, *inter alia*, that: (1) the vast majority of the items the Company authenticated were not processed by the Company's expert authenticators, but by copywriters with minimal training in authentication, and who were allotted insufficient time to authenticate items; (2) hundreds of counterfeit luxury items slipped through the cracks in the Company's authentication process and were sold to customers; and (3) the Company failed to maintain internal controls.

**The Truth Gradually Emerges as False and Misleading Statements Continue**

*August 13, 2019 Press Release and Conference Call*

122.     After the market closed on August 13, 2019, the Company issued a press release containing the Company's financial results for the fiscal quarter ended June 30, 2019. The press release disclosed the year-over-year changes in the Company's AOV, revealing, for the first time, that the Company AOV had fallen to $452.61 during the second fiscal quarter of 2019, down from $453.32 during the second fiscal quarter of 2018.

123.    Later that same day, the Company held a conference call to discuss its financial results for the quarter. During the conference call, Defendant Gustke stated the following, in relevant part:

> ***Q2 AOV reflected earlier-than-expected promotional activity by retailers***, which resulted in lower average prices per item sold on a year-over-year basis.
>
> \* \* \*
>
> ***AOV was flat year-over-year in the quarter at \$453. That reflected average item price decreases across essentially all categories that we trace back to some pretty -- earlier than expected***. But as many on the call know, relatively aggressive promotional activity in the retail environment -- ***that happened earlier this year than it has in past years*** and had a depressive effect on resale prices through the quarter.

(Emphasis added.)

124.    On this news, the price of the Company's stock plummeted by approximately 16%, from \$17.00 per share at the close of trading on August 13, 2019, to \$14.28 per share at the close of trading on August 14, 2019.

### *September 13, 2019 Fashionista Article*

125.    On September 13, 2019, Fashionista published the Fashionista Article, which described the findings of a private investigation into the Company's authentication process conducted by The Capitol Forum, a news and analysis service focused on consumer protection.

126.    The Fashionista Article detailed a number of interviews with former Company employees, who explained the reality of the Company's authentication process—one that hardly lined up with the Individual Defendant's public representations. The Fashionista Article stated the following, in relevant part:

> The report alleges that hourly workers with the title "copywriter," rather than professional authenticators, are performing the majority of authentication of consigned items before writing their descriptions and posting them on the website. Seven former TRR copywriters were interviewed for the report, all of whom said they didn't feel it was appropriate for them to be authenticating.

For one, the training they received was reportedly quite minimal. "They give you a quick 5-minute presentation on what things should look like and then have you go. [...] I should not have been authenticating an Hermes scarf, for example, but all they care about is the product getting on the site," said one former employee. Additionally, according to the former employees, the job had such a high turnover rate that experience levels remained low.

"The pay was so low and the work so grueling that everybody thought of it as just a temporary job," said one interviewee, "so no one really took it that seriously because they'd be gone in a couple of months."

Employees are also reportedly required to hit quotas that could exceed 120 items per day, per person. And, according to their accounts, that's 120 *processed* items; items found to be inauthentic didn't count, and while they could pass items they were unsure about off to be reviewed by professional authenticators, that process would take time away from meeting their mandatory quotas. Per one former copywriter, "Training was rushed and they put a lot of pressure on meeting our daily goals, so a lot of fake items slipped through the cracks because of all the goods we had to authenticate in one day, which could be 130 to 155 depending on what department you worked in. Our days were super long and draining, so a majority of employees were rushing to meet the quota so that they would not get fired. It was more about not getting fired than authenticating the goods." There were also allegedly perks for exceeding one's quota, like site credit.

127.    The Fashionista Article also noted that in an attempt to refute The Capitol Forum's findings, the Company had provided Fashionista with a response to the article, which confirmed in part certain of the Fashionista Article's allegations, stating the following:

> Asked to respond, ***The RealReal confirmed to Capitol Forum that copywriters do authenticate products that it identifies as "low-risk" while more trained professionals take "high-risk items," also saying that "we're not training them on everything, they have guides they can refer to."*** The company also claimed that employees could take as much time as needed to authenticate goods but would reportedly not acknowledge the existence of quotas.

* * *

> In response to the report, The RealReal provided the following comment to Fashionista: "This company's actions and misrepresentations are clearly calculated to sell their subscriptions and improperly manipulate the market for the benefit of short-sellers on behalf of their subscribers. These people are not journalists and they are not credible. ***The RealReal stands 100% behind our state-of-the-art authentication process***."

(Emphasis added.)

128.    On this news, the price of the Company's stock dropped from $17.01 per share at the close of trading on September 13, 2019, to $16.75 per share at the close of trading on September 16, 2019, the next trading day.

***September 26, 2019 Wells Fargo Conference***

129.    On September 26, 2019, Defendant Gustke attended Wells Fargo's Consumer Conference. During the conference, Defendant Gustke stated the following about customers' trust in the Company's authentication process:

> At the basis of the business is two pillars. For buyers it is trust and we establish that through taking possession of goods and authenticating through a no risk multi-point process -- absolutely, every item.

* * *

> [B]uyers come to us and give us a chance because they trust us and they trust us because we authenticate every item.

130.    In response to a question from an investor analyst, Defendant Gustke described the steps in the Company's authentication process as follows:

> ***It is literally everything to what we do. It is central to who we are, to what our brand stands for. It is in our name, it is -- there's nothing more important to what we do.*** So here's how it actually works. So, every product that is brought into us we see physically and it goes through a multi-point brand specific or product specific inspection. And that product can be touched by multiple people throughout its journey before it even makes it to the site.

* * *

> If it doesn't trip any of those flags it's going to move on to the copywriting function. Copywriters do a bunch of things. In addition to authentication they are setting price -- less and less frequently because algorithms are doing that. They are creating the taxonomy for items, they are writing a description, a title, taking measurements, etc., and they are trained in a specific category.

> ***So, you have a copywriter who specializes in women's contemporary or in handbags or sneakers and they receive deep training in their area of***

38

> ***specialization.*** And the people doing that training are the experts. The experts in
> turn will be reviewing high-risk items personally.

(Emphasis added.)

131.    The statements referenced in ¶¶ 125–126 were materially false and misleading
because they failed to disclose, *inter alia*, that: (1) the vast majority of the items the Company
authenticated were not processed by the Company's expert authenticators, but by copywriters with
minimal training in authentication, and who were allotted insufficient time to authenticate items;
(2) hundreds of counterfeit luxury items slipped through the cracks in the Company's
authentication process and were sold to customers; and (3) the Company failed to maintain internal
controls.

### October 23, 2019 Forbes Article

132.    On October 23, 2019, Forbes published an article titled, "The RealReal Sold Me A
$3,600 Fake; Here's Why Counterfeits Slip Through Its Authentication Process."[2] The article
corroborated many of the claims made in the Fashionista Article, stating the following, in relevant
part:

> Yet a recent report by consumer protection group The Capitol Forum (as described
> in  this article on *Fashionista)* is  consistent  with  information  I  got  from  two
> informed, confidential sources. They all say the actual process for authentication at
> The RealReal is different from the impression you get by reading the prospectus or
> visiting the company website.
>
> Here is the nub of the problem: A great deal of the authentication at The RealReal
> is done by people whose title is "copywriter." According to my sources, a majority
> of products sold are authenticated by these so-called copywriters. Normally, a
> copywriter is a person who, well, writes copy. And indeed the copywriters do write
> the copy–the words that accompany the pictures next to an item for sale on The
> RealReal's website–but they are also doing authenticating.

---

[2]    https://www.forbes.com/sites/richardkestenbaum/2019/10/23/if-fake-bags-are-being-sold-on-
the-realreal-how-can-the-resale-business-ever-succeed/#5c6eeeb06acb  (last  visited  April  16,
2020).

The problem is that the copywriters have a small fraction of the training that the more expert people have. That's a problem because, without the training that the true experts have, the copywriters can miss things, which are often things they shouldn't miss. The RealReal would not say anything about the depth of copywriters' authentication training except that they "are trained and tested on our authentication best practices." I was not able to find out how much training the copywriters get before they start authenticating, but everything I've heard and read about the copywriters indicates that they come to the job with little or (usually) no experience in authentication.

133.     The Forbes article also noted that its author had gone on a tour of one of the Company's facilities, where he spoke with employees and personally witnessed the Company's authentication process. The article discussed the tour, and the author's conclusions as to the Company's misleading representations as follows:

The employees I met were open about having copywriters doing the authenticating, and I saw it myself. They do it by dividing products into what they consider to be "high-risk" or "low-risk" categories. Products that are known to attract forgers–either because they are very desirable, very popular, very expensive or some combination of the three–are sent to high-risk authenticators, who have more training and knowledge.

My sources say that the high-risk authenticators do as good a job as any human can; the problem is that not enough of the products go to them, and that's how fakes get through. As a result, consumers are buying fakes, and no one knows how many because too many products are authenticated by copywriters.

* * *

There are a host of reasons what's happening is wrong. The first is that it's bad for consumers. Most people don't have access to experts who can tell them that the $3,600 bag they bought is fake. What's even worse is that when a maker of fake bags succeeds in selling a fake on The RealReal, it encourages that maker to produce more fake bags, and that compounds the problem.

The other group of victims is investors. When I read the prospectus, the chart above and The RealReal website, I get the clear impression that the authenticators and the copywriters are different people. There is no mention of having two tiers of authenticators. Investors putting up money in The RealReal might make a different decision if they were told more about how the authentication process works. They would be more likely to suspect that $3,600 bag being sold was as fake as the bag I bought. That would make The RealReal a less interesting investment opportunity.

134.    On this news, the price of the Company's stock dropped by over 9%, from $20.93 per share at the close of trading on October 22, 2019, to $19.03 per share at the close of trading on October 23, 2019.

***November 4, 2019 Conference Call***

135.    On November 4, 2019, the Company held a conference call to discuss the Company's financial results for the fiscal quarter ended September 30, 2019. During the call, Defendant Wainwright again reiterated that "authentication is core and central to our brand," and stated that though certain "high risk" items were authenticated by the Company's expert authenticators, "other items are authenticated by our copywriters. These – this team which is very large are trained in specific categories and specific brands."

136.    The statements referenced in ¶ 131 were materially false and misleading because they failed to disclose, *inter alia*, that: (1) the vast majority of the items the Company authenticated were not processed by the Company's expert authenticators, but by copywriters with minimal training in authentication, and who were allotted insufficient time to authenticate items; (2) hundreds of counterfeit luxury items slipped through the cracks in the Company's authentication process and were sold to customers; and (3) the Company failed to maintain internal controls.

***November 5, 2019 CNBC Article***

137.    On November 5, 2019, CNBC published an article detailing an in-depth investigation into RealReal's authentication process, which included interviews with dozens of former Company employees, who stated that they were given little training in authentication and were forced to meet harsh quotas.[3] The article stated the following, in relevant part:

---

[3]    https://www.cnbc.com/2019/11/05/the-realreals-no-fakes-pledge-is-threatened-by-poor-training-quotas.html (last visited April 16, 2020).

A CNBC investigation found real questions about that claim, after interviewing nearly three dozen former employees, speaking to unsatisfied customers around the country and obtaining an internal company document from 2018 that shows copywriters in the Secaucus, New Jersey, warehouse have been tasked with authenticating some of the items that go on The RealReal's site.

* * *

Copywriters said they had little training on how to spot fakes and were hired to write descriptions of the items to post on the website. Broadly speaking, there isn't any formal training or certification for authenticators who handle luxury items in the industry. But those who do this type of work say fakes are becoming more and more difficult to spot.

* * *

Dozens of former employees — most who were afraid to be quoted by name — said the company's claim of expert authentication was not accurate.

* * *

Parchment and other former employees said that copywriters, who often examined the items, did not have sufficient training to spot fakes.

"It's so much product. It's really hard for someone to properly authenticate something when they're not probably the best qualified to be even doing that in the first place," she said. "And they're being rushed to hit a goal."

* * *

"I don't think anyone had enough training at the end of the day," Parchment said. "The fakes are getting really good. And when you have such a high volume that you have to get through and you're worried about hitting your goal, at the end of the day, I don't really think they cared whether it was real or not anyway."

Internal documents stated copywriters have been subject to disciplinary action if a minimum of 50% of their daily quota was not met.

"It is expected that copywriters will reach their daily quota during their shift," a document marked "updated Feb. 1, 2019″ stated. "Daily quotas are set depending on the category the copywriter is in. Copywriters are expected to consistently reach their daily quotas."

In the ready-to-wear category, the daily quota was 105 items for an eight-hour shift and 131 items for a 10-hour shift. In contemporary ready-to-wear, it was 128 items for an eight-hour shift and 160 items for a 10-hour shift.

The RealReal's use of copywriters to authenticate items is not new. Greta Stehr, a former luxury manager in Los Angeles for The RealReal, said she saw that firsthand during an employee tour of the Secaucus warehouse in 2015.

"The first time that I became aware of something like this happening was when we had a company tour of the Secaucus warehouse during one of our annual summits," Stehr said.

\* \* \*

"So instead of the top-tier authenticators taking a long time, a sufficient amount of time to review each piece, most pieces were being handled by the copywriters, and only very, very high-value items, it seemed, were being authenticated by the actual lead authenticators," she said.

"It was very surprising because I was under the impression, even as an employee, that every item was authenticated by an expert. And it didn't really seem to be the case when we saw what was actually happening," she said.

138.    On this news, the price of the Company's stock dropped by over 10%, from $21.73 per share at the close of trading on November 4, 2019, to $19.37 per share at the close of trading on November 5, 2019. The Company's share price continued to drop over the course of the next trading day, falling to $17.93 per share at the close of trading on November 6, 2019.

### *November 12, 2019 Press Release*

139.    On November 12, 2019, the Company issued a press release that contained a letter form Defendant Wainwright addressing the allegations in the November 5, 2019 CNBC article. The letter stated the following, in relevant part:

When I started The RealReal from my kitchen table, I knew earning customers' trust would be foundational to building this business. Over the last eight years, we have worked tirelessly to gain and maintain your confidence by creating a safe, reputable marketplace for authenticated luxury consignment.

\* \* \*

**The RealReal has the most rigorous authentication process in the marketplace. We are the only resale company in the world that authenticates every single item we sell.** There is no other resale company doing more to remove fakes from the market every day and put counterfeiters out of business.

(Emphasis added.)

140.     The statements referenced in ¶ 135 were materially false and misleading because they failed to disclose, *inter alia*, that: (1) the vast majority of the items the Company authenticated were not processed by the Company's expert authenticators, but by copywriters with minimal training in authentication, and who were allotted insufficient time to authenticate items; (2) hundreds of counterfeit luxury items slipped through the cracks in the Company's authentication process and were sold to customers; and (3) the Company failed to maintain internal controls.

### The Truth Fully Emerges

### *November 21, 2019 CNBC Article*

141.     Finally, on November 21, 2019, CNBC published a second article, as a follow-up to its November 5, 2019 article on the Company.[4] The article described a series of documents titled "Copywriting Faux and Tell" that were circulated internally among copywriters at the Company on a weekly basis. These documents described the different types of counterfeit products that "slipped through [RealReal's] vetting process." The article detailed the "Copywriting Faux and Tell" documents as follows:

> The internal documents, called "Copywriting Faux and Tell," are "a weekly recap of TRR published and returned counterfeits." They were sent to copywriters at the company's warehouse in Brisbane, California.
>
> * * *
>
> A total of 227 pages from the first and third quarters of 2019 show specific examples of what are labeled "TRR fakes." The items include purported Louis Vuitton slides in a style that was never created. Ugg boots marked with the wrong logo and bow. Moncler track pants tagged with a label that says T-shirt. A separate pair of slides from "The Row" and a Valentino scarf were supposed to be made in Italy but the label on the TRR fakes say they were "Made in China."

---

[4] https://www.cnbc.com/2019/11/20/the-realreals-faux-and-tell-discloses-fakes-published-on-the-site.html (last visited April 16, 2020).

* * *

While the documents were sent to copywriters at the company's Brisbane, California warehouse, a former employee at the Secaucus, New Jersey, warehouse told CNBC that she saw similar documents during presentations to staff.

* * *

The RealReal has advertised on its Facebook page that it "is the leader in authenticated luxury consignment. With an expert behind every item, we ensure everything we sell is 100% real."

The reference to "100% real" was removed from the page on Nov. 5, the day the CNBC investigation aired.

Claims of everything "100% authentic" also have been scrubbed from the company's website.

142.    On this news, the price of the Company's stock dropped once more, falling by approximately 5% on heavy trading volume, from $16.93 per share at the close of trading on November 20, 2019, to $16.15 per share at the close of trading on November 21, 2019.

## DAMAGES TO REALREAL

143.    As a direct and proximate result of the Individual Defendants' conduct, RealReal will lose and expend many millions of dollars.

144.    Such expenditures include, but are not limited to, legal fees associated with the Securities Class Actions filed against the Company and the Individual Defendants, and any internal investigations, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

145.    Additionally, these expenditures include, but are not limited to, lavish compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

146.    As a direct and proximate result of the Individual Defendants' conduct, RealReal has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's

discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE ALLEGATIONS

147.   Plaintiff brings this action derivatively and for the benefit of RealReal to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of RealReal, gross mismanagement, abuse of control, waste of corporate assets, and unjust enrichment, as well as the aiding and abetting thereof.

148.   RealReal is named solely as a nominal party in this action.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

149.   Plaintiff is, and has been at all relevant times, a shareholder of RealReal.  Plaintiff will adequately and fairly represent the interests of RealReal in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

150.   Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

151.   A pre-suit demand on the Board of RealReal is futile and, therefore, excused.  At the time of filing of this action, the Board consists of the following eight individuals: Defendants Wainwright, Baird, Krolik, Kumin, Leondakis, and Miller (the "Director-Defendants"), along with non-parties Caretha Coleman and Carol Melton (together with the Director-Defendants, the "Directors"). Plaintiff needs only to allege demand futility as to four of the eight Directors that were on the Board at the time this action was commenced.

152.     Demand is excused as to all of the Director-Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material facts, which renders them unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

153.     In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly participated in causing the Company to make the materially false and misleading statements alleged herein.  The fraudulent scheme was intended to make the Company appear more profitable and attractive to investors.  As a result of the foregoing, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

154.     Additional reasons that demand on Defendant Wainwright is futile follow. Defendant Wainwright is the founder of the Company, and has served as the Company's President, CEO, and Chairperson of the Board since March 2011. Thus, as the Company admits, she is a non-independent director. The Company provides Defendant Wainwright with her principal occupation, and she receives handsome compensation, including $535,484 in 2018 for her services. Defendant Wainwright was ultimately responsible for all of the false and misleading statements and omissions that were made, including those contained in the Company's SEC filings and press releases referenced herein, many of which she either personally made or signed off on. As the Company's highest officer and as a trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the

scheme, and consciously disregarded her duties to protect corporate assets. Moreover, Defendant Wainwright is a defendant in the Securities Class Actions. For these reasons, Defendant Wainwright breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

155.    Additional reasons that demand on Defendant Baird is futile follow. Defendant Baird has served as a Company director since June 2018. He also serves as the Chair of the Nominating and Corporate Governance Committee. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Baird signed, and thus personally made the false and misleading statements in the Registration Statement. Moreover, Defendant Baird is a defendant in the Securities Class Actions. For these reasons, Defendant Baird breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

156.    Additional reasons that demand on Defendant Krolik is futile follow. Defendant Krolik has served as a Company director since January 2019. He also serves as the Chair of the Audit Committee. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Krolik signed, and thus personally made the false and misleading statements in the Registration Statement. Moreover, Defendant Krolik is a defendant in the Securities Class Actions. For these reasons, Defendant

Krolik breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

157.    Additional reasons that demand on Defendant Kumin is futile follow. Defendant Kumin has served as a Company director since May 2017. He also serves as the Chair of the Compensation Committee, and as a member of the Nominating and Corporate Governance Committee. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Kumin signed, and thus personally made the false and misleading statements in the Registration Statement. Moreover, Defendant Kumin is a defendant in the Securities Class Actions. For these reasons, Defendant Kumin breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

158.    Additional reasons that demand on Defendant Leondakis is futile follow. Defendant Leondakis has served as a Company director since April 2019. She also serves as a member of the Compensation Committee. As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Furthermore, Defendant Leondakis signed, and thus personally made the false and misleading statements in the Registration Statement. Moreover, Defendant Leondakis is a defendant in the Securities Class Actions. For these reasons, Defendant Leondakis breached her fiduciary duties, faces a substantial likelihood

of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

159.    Additional reasons that demand on Defendant Miller is futile follow. Defendant Miller has served as a Company director since May 2019. He also serves as a member of the Audit Committee. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Miller signed, and thus personally made the false and misleading statements in the Registration Statement. Moreover, Defendant Miller is a defendant in the Securities Class Actions. For these reasons, Defendant Miller breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

160.    Additional reasons that demand on the Board is futile follow.

161.    Defendants Krolik and Miller (the "Audit Committee Defendants") served as members of the Audit Committee during the Relevant Period. Pursuant to the Company's Audit Committee Charter, the Audit Committee Defendants are responsible for overseeing, among other things, the Company's accounting and financial reporting processes and the Company's compliance with legal and regulatory requirements. The Audit Committee Defendants failed to ensure the integrity of the Company's accounting and financial reporting processes, as they are charged to do under the Audit Committee Charter, allowing the Company to issue false and misleading financial statements with the SEC. Thus, the Audit Committee Defendants breached their fiduciary duties, are not disinterested, and demand is excused as to them.

162.   The Director-Defendants have longstanding business and personal relationships with each other and the Individual Defendants that preclude them from acting independently and in the best interests of the Company and the shareholders.  For instance, Defendants Kumin and Miller both currently serve on the board of directors of Wayfair Inc.  These conflicts of interest precluded the Directors from adequately monitoring the Company's operations and internal controls and calling into question the Individual Defendants' conduct. Thus, demand upon the Director-Defendants would be futile.

163.   In violation of the Code of Conduct, the Director-Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to cause the Company to engage in improper accounting practices, to issue materially false and misleading statements to the public, and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, gross mismanagement, abuse of control, waste of corporate assets, and unjust enrichment.  In violation of the Code of Conduct, the Director-Defendants failed to comply with laws and regulations, maintain the accuracy of Company records and reports, avoid conflicts of interest, conduct business in an honest and ethical manner, protect and properly use corporate assets, and properly report violations of the Code of Conduct.  Thus, the Director-Defendants face a substantial likelihood of liability and demand is futile as to them.

164.   RealReal has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director-Defendants have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for RealReal any part of the damages RealReal suffered and will continue to suffer thereby.  Thus, any demand upon the Directors would be futile.

165.    The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct.  Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists).  As a majority of the Directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company.  Accordingly, demand is excused as being futile.

166.    The acts complained of herein constitute violations of fiduciary duties owed by RealReal's officers and directors, and these acts are incapable of ratification.

167.    The Director-Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of RealReal.  If there is a directors' and officers' liability insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Directors, known as, *inter alia*, the "insured-versus-insured exclusion."  As a result, if the Director-Defendants were to sue themselves or certain of the officers of RealReal, there would be no directors' and officers' insurance protection.  Accordingly, the Director-Defendants cannot be expected to bring such a suit.  On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery.  Thus, demand on the Director-Defendants is futile and, therefore, excused.

168.    If there is no directors' and officers' liability insurance, then the Director-Defendants will not cause RealReal to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability.  Accordingly, demand is futile in that event, as well.

169.    Thus, for all of the reasons set forth above, all of the Director-Defendants, and, if not all of them, at least four of the Directors, cannot consider a demand with disinterestedness and independence.  Consequently, a demand upon the Board is excused as futile.

## **FIRST CLAIM**

### **Against the Individual Defendants for Breach of Fiduciary Duties**

170.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

171.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of RealReal's business and affairs.

172.    Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

173.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of RealReal.

174.    In breach of their fiduciary duties owed to RealReal, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and/or misleading statements and/or omissions of material fact that failed to disclose that: (1) the vast majority of the items the Company authenticated were not processed by the Company's expert authenticators, but by copywriters with minimal training in authentication, and who were allotted insufficient time to

authenticate items; (2) hundreds of counterfeit luxury items slipped through the cracks in the Company's authentication process and were sold to customers; (3) the Company's year-to-year AOV for the second fiscal quarter of 2019 had decreased as a result of price cuts that the Company had already been implementing since the first fiscal quarter of 2019; (4) as a result, the Company's business and operating results, including its GMV, would be negatively impacted; and (5) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

175.   The Individual Defendants further failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and/or omissions of material fact.

176.   Also in breach of their fiduciary duties, the Individual Defendants failed to maintain internal controls.

177.   The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements and representations. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them.  Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of RealReal's securities.

178.   The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent schemes set forth herein and to fail to maintain internal controls.  The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent schemes set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the

Company to improperly engage in the fraudulent schemes and to fail to maintain adequate internal controls, even though such facts were available to them.  Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of RealReal's securities.

179.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

180.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, RealReal has sustained and continues to sustain significant damages.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

181.    Plaintiff on behalf of RealReal has no adequate remedy at law.

## SECOND CLAIM

### Against Individual Defendants for Unjust Enrichment

182.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

183.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, RealReal.

184.    The Individual Defendants either benefitted financially from the improper conduct or received bonuses, stock options, or similar compensation from RealReal that was tied to the performance or artificially inflated valuation of RealReal, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

185.    Plaintiff, as a shareholder and a representative of RealReal, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, benefits, and other compensation, including any performance-based or

valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

186.    Plaintiff on behalf of RealReal has no adequate remedy at law.

## THIRD CLAIM

### Against Individual Defendants for Abuse of Control

187.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

188.    The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence RealReal, for which they are legally responsible.

189.    As a direct and proximate result of the Individual Defendants' abuse of control, RealReal has sustained significant damages.  As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations of candor, good faith, and loyalty, RealReal has sustained and continues to sustain significant damages.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

190.    Plaintiff on behalf of RealReal has no adequate remedy at law.

## FOURTH CLAIM

### Against Individual Defendants for Gross Mismanagement

191.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

192.    By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of RealReal in a manner consistent with the operations of a publicly-held corporation.

193.    As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, RealReal has sustained and will continue to sustain significant damages.

194.    As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

195.    Plaintiff on behalf of RealReal has no adequate remedy at law.

### FIFTH CLAIM

**Against Individual Defendants for Waste of Corporate Assets**

196.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

197.    As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, Defendants have caused RealReal to waste valuable corporate assets, to incur many millions of dollars of legal liability and/or costs to defend unlawful actions, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

198.    As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

199.    Plaintiff on behalf of RealReal has no adequate remedy at law.

### SIXTH CLAIM

**Against the Individual Defendants for Contribution
Under Sections 10(b) and 21D of the Exchange Act**

200.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

201.    RealReal and each of the Individual Defendants are named as defendants in the Securities Class Actions, which assert claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder, as well as Sections 11 and 15 of the Securities Act. If and when the Company is found liable in the Securities Class Actions for these violations of the federal securities laws, the Company's liability will be in whole or in part due to the Individual Defendants' willful and/or reckless violations of their obligations as officers and/or directors of RealReal.

202.    The Individual Defendants, because of their positions of control and authority as officers and/or directors of RealReal, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of RealReal, including the wrongful acts complained of herein and in the Securities Class Actions.

203.    Accordingly, the Individual Defendants are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

204.    As such, RealReal is entitled to receive all appropriate contribution or indemnification from the Individual Defendants.

## **PRAYER FOR RELIEF**

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)    Declaring that Plaintiff may maintain this action on behalf of RealReal, and that Plaintiff is an adequate representative of the Company;

(b)    Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to RealReal;

(c)    Determining and awarding to RealReal the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)    Directing RealReal and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect RealReal and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the board;

2. a provision to permit the shareholders of RealReal to nominate at least four candidates for election to the board; and

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

(e)    Awarding RealReal restitution from the Individual Defendants, and each of them;

(f)    Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)    Granting such other and further relief as the Court may deem just and proper.

Dated: September 10, 2020

Respectfully submitted,

**FARNAN LLP**

/s/ Michael J. Farnan
Brian E. Farnan (Bar No. 4089)
Michael J. Farnan (Bar No. 5165)
919 N. Market St., 12th Floor
Wilmington, DE 19801
Telephone: (302) 777-0300
Facsimile: (302) 777-0301
Email: bfarnan@farnanlaw.com
        mfarnan@farnanlaw.com

Of Counsel:

**THE BROWN LAW FIRM, P.C.**
Timothy Brown
240 Townsend Square
Oyster Bay, NY 11771
Telephone: (516) 922-5427
Facsimile: (516) 344-6204
Email: tbrown@thebrownlawfirm.net